# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

| | | |
|---|---|---|
| TAMARA JEAN MOSS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:16-cv-06127-NKL |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Tamara Jean Moss appeals the Commissioner of Social Security's final decision denying her application for supplemental security income. The decision is affirmed.

## I.    Background

Moss was born in 1963. She alleges that she became disabled on September 1, 2004, and filed an application for benefits on May 8, 2013. The Administrative Law Judge held a hearing and denied her application on June 8, 2015. The Appeals Council denied her request for review on July 29, 2016.

Moss' appeal to this Court focuses on her alleged depression, which the ALJ concluded was non-severe, and the sufficiency of support for the ALJ's determination of her residual functional capacity, which Moss claims fails to account for her pain symptoms, in particular those caused by fibromyalgia.

## A.    Psychological history[1]

Arihant Jain, M.D., was one of Moss' primary care providers through June 2013. His treatment records for the period from June 2012 through June 2013 state that Moss had normal mental status exams, although the doctor once noted that Moss' mood was depressed and once noted that she was crying, and other times noted that her ability to concentrate was decreased. During this time period, the doctor never formally diagnosed depression, nor offered Moss treatment for mental health issues such as by prescribing psychotropic medication or referring her for counseling.

William Irby, D.O., another primary care provider, saw Moss about five times from December 2012 to January 2014 for routine care. In July and September 2013, Dr. Irby diagnosed Moss with anxiety and depression, and prescribed Prozac, noting that Moss had feelings of hopelessness and depression, and little interest or pleasure in doing things. In December 2013, Dr. Irby noted that Moss' mood was "euthymic," Tr. 530, or normal, and he did not renew the Prozac. In January 2014, Dr. Irby again noted that Moss' mood was euthymic, and under the "test conclusions" portion of the treatment record, wrote that Moss had "no feelings of depression," nor any loss of interest in activities. Tr. 528.

Barb Zoubek, a "case/care coordinator"[2] in Dr. Jain's and Dr. Irby's office, visited with

---

[1]     Moss filed a prior application for supplemental security income in 2010, concerning allegedly disabling impairments of depression, disorders of the cervical spine, and obesity. Evidence before the ALJ in that case included the treatment records of Arihant Jain, M.D., Moss' primary care provider. That application was denied on March 23, 2012. Tr. 80-94 (ALJ decision in the prior case). Berryhill states that the prior decision is final. Doc. 11, p. 3 n.3. Nothing in the record suggests otherwise, nor does Moss dispute that it is final.

Accordingly, *res judicata* applies to the issues that were decided in the prior case. *See* 20 C.F.R. § 404.957(c)(1) (*res judicata* applies to a previous determination about benefits that was made on the same facts and on the same issues, when the previous determination has become final either by administrative or judicial action). Thus, for purposes of the Moss' current application and allegations relating to depression, the relevant time period begins after March 23, 2012, the date of the prior decision.

Moss before appointments or phoned her a few times between August 2012 and March 2014. On August 21, 2012 Moss told Zoubek that she was doing alright. On August 31, 2012, Zoubek noted that Moss was tearful, complaining of pain and that her husband had left her. Moss reported that she had tried Prozac for depression but it did not help because she could not also afford counseling. Tr. 327. In September 2012, Moss said she was doing okay but would probably never get over her divorce. *Id.* In January 2013, Zoubek noted that Moss was very tearful, reporting that a young relative had recently died. Moss also said she was "not interested" in working on anything to improve her health at the time. Tr. 318. In March 2014, Moss told Zoubek that she was doing okay.

## B. Medical history

Dr. Jain treated Moss for neck, back, and shoulder pain from December 2010 through May 2013. Physical exam findings showed tenderness in those areas, as well as dysfunction such as weakness and abnormal movement of the shoulders, and the doctor prescribed pain medication, muscle relaxers, and home exercises. At a visit on March 21, 2011, the doctor noted that he would consult an orthopedist and order an MRI of Moss' cervical spine because he thought it was "likely" that Moss' symptoms were related to a cervical spine abnormality. Tr. 267-68. On April 26, 2011, Dr. Jain's Assessment included localized osteoarthritis of the right shoulder, AC joint; compression arthralgia of the right shoulder; cervical spondylosis; myalgia and myositis; and fibromyalgia. At a visit on January 18, 2012, Dr. Jain performed a physical exam and his Assessment was hypertension, cervical spondylosis (C5-C6), nicotine dependence, and obesity.

At a visit on June 8, 2012, Moss told Dr. Jain that she was upset about how he had filled

---

2 The record does not reflect Zoubek's licensure.

out her disability paperwork, in that he had not included diagnoses of fibromyalgia, or arthritis in her neck, and that he had suggested she was not giving good effort on exam. Dr. Jain told Moss that he did not recall filling out forms, but that he would include a diagnosis of fibromyalgia in her records. Tr. 332. The doctor's Assessments at that visit included fibromyalgia, as well as localized primary osteoarthritis of the left knee and cervical spondylosis (C5-C6). Tr. 334. In December 2012, Dr. Jain noted that Moss' musculoskeletal exam was "normal," she had "[n]o sensory exam abnormalities," and "motor exam demonstrated no dysfunction." Tr. 320. The Assessment was osteoarthritis of the knee. Tr. 321. On subsequent visits, through May 2013, the doctor's Assessments included the diagnoses of fibromyalgia and cervical spondylosis (C5-C6). *See* Tr. 331 (July 11, 2012); Tr. 329 (August 31, 2012); Tr. 326 (October 12, 2012); Tr. 323 (November 12, 2012); Tr. 317 (March 19, 2013); and Tr. 313 (May 20, 2013).

Dr. Jain never ordered any limitations in Moss' physical activities. Rather, under "Counseling/Education," the treatment record numerous times noted that "[t]he patient's goal is to maintain regular exercise." Tr. 369 (January 18, 2012); Tr. 234 (June 8, 2012); Tr. 329 (August 31, 2012); Tr. 326 (October 12, 2012); Tr. 323 (November 12, 2012); Tr. 317 (March 19, 2013); and Tr. 313 (May 20, 2013).

Moss began seeing another primary care provider, Dr. Irby, in 2013. On July 11, 2013, Dr. Irby's physical exam elicited pain on moving the shoulder, but under Assessments, the diagnoses related to anxiety and depression. Tr. 532-33. Dr. Irby did not prescribe medication for the mental health diagnoses. At a visit on September 12, 2013, Dr. Irby found multiple joint aches on exam, especially in the right shoulder, but no motor dysfunction or sensory abnormalities. His Assessments included depression, chronic pain syndrome, myalgias, and cervical spondylosis (C5-C6). Tr. 532. He prescribed Prozac and ordered a consultation with a

rheumatologist. On December 5, 2103, Dr. Irby noted that Moss' musculoskeletal exam was normal, no sensory abnormalities were noted, and that motor exam demonstrated no dysfunction. Tr. 530. The Assessment was UTI. He did not renew the Prozac. On January 8, 2014, Dr. Irby identified "multiple trigger points" on musculoskeletal exam, normal reflexes, and no motor dysfunction. Tr. 528. His Assessments were myalgia and myositis, and chronic pain syndrome, and he did not renew the Prozac. *Id.*

Moss saw Thomas Scott, M.D., a rheumatologist, in September 2013. Dr. Scott's Impressions were fibromyalgia, history of positive rheumatoid factor without clinical evidence of rheumatoid arthritis, and intolerance to multiple therapeutic agents for fibromyalgia. Tr. 410. Under Plan, the doctor ordered labs to check for an inflammatory disorder; provided Moss with literature about fibromyalgia; and noted that Moss should continue on her current medical regimen. *Id.* Nothing in the record reflects that Dr. Scott or any other rheumatologist treated Moss.

On January 24, 2013, Sharon Kavanaugh, D.C., performed a chiropractic adjustment to treat Moss' report of pain in the right upper back and left buttock. Dr. Kavanaugh performed another adjustment on September 26, 2013 for pain in Moss' right upper back, neck, and head.

### C.    Opinion evidence

Dr. Jain filled out a two-page, "Medical Source Statement—Mental" form in May 2013. Tr. 306-07. Under "Understanding and Memory," the doctor checked boxes indicating that Moss was moderately limited in the ability to remember locations and work procedures, and understand and remember detailed instructions. Under "Sustained Concentration and Persistence," the doctor indicated that Moss was markedly limited in the ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain

regular attendance, and be punctual; work in coordination or proximity with others without being distracted by them; and complete a normal work day and work week without interruption from psychological symptoms. He also indicated that she was moderately limited in the ability to carry out detailed instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions. Under "Social Interactions," he noted that she was markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers. He also noted that she was moderately limited in the ability to maintain socially appropriate behavior and adhere to the basic standards of neatness and cleanliness. Finally, under "Adapt," the doctor noted that she was markedly limited in the ability to respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions. He further noted that Moss was moderately limited in the ability to travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. The form indicates, in a preprinted section, that the assessment is based on the five factors listed: medical history, clinical findings, laboratory findings, diagnosis, and treatment prescribed and prognosis. Tr. 307. Dr. Jain did not provide any written notes about the five factors. The ALJ gave the opinion little weight. Tr. 23.

Dr. Jain also filled out a two-page, "Medical Source Statement—Physical" form in May 2013. Tr. 308-09. Dr. Jain checked the boxes pertaining to least effort, under every subpart of the first section, "Physical Strength Factors": lift and/or carry frequently—less than five pounds; life and/or carry occasionally—less than five pounds; stand and/or walk continuously— less than 15 minutes; stand and/or walk throughout an eight-hour day—less than one hour; sit continuously at one time—less than 15 minutes; sit throughout an eight-hour day—less than one hour; push and/or pull—limited to no pushing or pulling over five pounds for more than five

minutes due to neck and shoulder pain. Tr. 309. Under "Postural & Manipulative Factors," Dr. Jain checked boxes indicating that Moss could occasionally (up to one-third of the time) climb, balance, stoop, kneel, crouch, and crawl, and could frequently (one-third to two-thirds of the time) reach, handle, finger, feel, see, speak, and hear. Tr. 309. He noted that Moss would need a cane to ambulate. Under "Pain Factors," where the form asks whether the patient's pain or pain medication affects her concentration, persistence, or pace, or cause other limitations, the doctor checked "Yes," and wrote, "Patient on pain medications causing decreased concentration and attention span," but provided no other details about the extent or duration of such symptoms. Tr. 309. Like the MSS-Mental form that he filled out, the MSS-Physical form contains the five, pre-printed factors upon which the assessment is based. Tr. 309. Dr. Jain did not provide any written description about the factors. The ALJ gave the opinion little weight. Tr. 23.

Moss was scheduled to be examined by Samuel Preylo, Psy.D., a State agency, psychological consultant, in August 2013, but never showed up. She was rescheduled for September 4, 2013. Although she received a reminder call for the rescheduled appointment the evening before, she arrived a half-hour late, and said that she moved slowly due to pain. The doctor's office told her there was not enough time left for the appointment that morning, but that there would be enough time if she came back in the afternoon, a few hours later. Moss said she could not come back and the mental evaluation was never rescheduled.

Mark Altomari, Ph.D., a State agency medical consultant, reviewed Moss' records on September 9, 2013 and opined that although there was evidence of an anxiety and affective disorder, there was insufficient evidence to show that Moss had restrictions in activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace; or that she had had any episodes of decompensation. Tr. 68-70. Dr. Altomari also noted Moss' failure

to cooperate and attend the evaluation by Dr. Preylo. The ALJ gave the opinion significant weight. Tr. 23.

Moss was evaluated by Brandon Sigrist, a physician's assistant with the Orthopedic & Sports Medicine Center, at the request of the State agency on December 19, 2013. Sigrist noted that Moss was "somnolent" when he went to get her from the waiting room and that Moss said she did not sleep well. Tr. 361. She stated that she was miserable from pain in her neck that went down her right shoulder and hand, rating the pain at 8 out of 10 that day. Sigrist noted that Moss appeared to be in "moderate distress" throughout the exam and that the exam was difficult to perform due to Moss' pain. *Id.* She had limited range of motion in the neck and right shoulder, although her muscle tone appeared normal bilaterally, without obvious atrophy. X-rays of the right shoulder showed moderate degeneration of the AC joint, no acute bony abnormalities, and well-maintained joint space at the glenohumeral articulation. X-rays of the cervical spine showed no spondylolisthesis or acute bony abnormalities, but did show diffuse degenerative changes throughout the cervical spine. Sigrist also noted reviewed prior MRIs of Moss' cervical and thoracic spine, May and June 2011. Sigrist's Impression was neck pain, and right shoulder and upper extremity pain with numbness and tingling. Under Plan, he noted that further workup was warranted, but "believe[d] she has a physical disability which prevents her from engaging in gainful employment or gainful activity," of an estimated duration of "6 to 12 months or possibly longer." Tr. 362. Sigrist noted that he had reviewed the report with Corey A. Trease, M.D. The ALJ gave the opinion little weight. Tr. 24.

Dr. Kavanaugh, Moss' chiropractor, filled out a Medical Source Statement—Physical form on February 4, 2015. Tr. 373-75. Dr. Kavanaugh opined that Moss could rarely lift or carry less than ten pounds, and never lift or carry 50 pounds; frequently balance, occasionally

twist or crouch, rarely stoop or crawl, and never climb; frequently finger and feel, and rarely reach or handle; sit for 45 minutes at a time and sit at least six hours total in an eight-hour work day; stand 20 minutes at a time before needing to sit or walk, and stand two hours total in an eight-hour work day; needed to shift positions from standing to walking at will; needed five unscheduled, 30-minute rest breaks a day due to "pain, paresthesia, numbness" and "muscle weakness"; needed "no" can or other assistive device; did not need to elevate her legs; would be off task for 25% of the day; was incapable of "low stress" work; and would miss more than four days of work per month due to her conditions. Tr. 374-75. Where asked on the form to identify clinical findings and objective signs, Dr. Kavanaugh noted "muscle spasms at right trapezius & rhomboids with signs of inflammation, decreased [range of motion] in right shoulder." Tr. 373. Then, where asked about treatment, the doctor noted, "Chiropractic treatment has decreased pain & increased [range of motion]." *Id.* The ALJ gave the opinion little weight.

A vocational expert, Janice Barnes-Williams, testified at the hearing before the ALJ. Tr. 56-63. The ALJ asked about a hypothetical individual of Moss' age, with the same education and work experience, who can occasionally lift 20 pounds; frequently lift ten pounds; stand, walk, or sit up to six hours; needed to alternate between sitting and standing every 30 minutes; occasionally climb ramps or stairs, stoop, kneel, crouch; never climb ladders, ropes, or scaffolds; and never balance or crawl; who must avoid to overhead reaching bilaterally; who must avoid exposure to temperature and humidity extremes, excessive vibration, unprotected heights; and who can tolerate no more than occasional exposure to pulmonary irritants Tr. 57-58. The hypothetical did not include any mental limitations. The expert opined that such an individual could perform Moss' past relevant work as a call center, customer service representative. The expert further opined that the individual could perform the requirements of representative

occupations such as retail marker, inserting machine operator, and electronics sub-assembler. Each of the three occupations is classified as unskilled and SVP 2[3], light exertional level, and available in significant numbers in the national and Missouri economies. The expert further opined that employers typically provide a 15-minute rest break in the morning and in the afternoon, and a 30- to 60-minute lunch break, and typically tolerate one sick-day absence per month. Finally, the expert stated that her testimony was consistent with the Dictionary of Occupational Titles.

**D.    Moss' hearing testimony, Adult Function Reports, and employment history**

Moss testified during the hearing before the ALJ on February 23, 2015. She has a GED. She lives by herself in a one-bedroom, street-level apartment. She has a driver license and drives one or two times a week. She goes to the post office once a month to get money orders to pay bills. She shops for groceries three times a month, making a 50-mile round-trip to Wal-Mart "because they have the carts I can sit on and drive." Tr. 39. About once a month she drives to see her younger daughter and grandchild, who live about seven miles away. She said that she drives once a month to see her mother, who lives about 40 or 45 miles away, "to get my money to live on." Tr. 40. She goes to see her father, who lives about 35 or 40 miles away, about three times a year and will spend the night there due to the pain caused by the drive. She drives to visit her older daughter and grandchildren, who live 60 miles away, about twice a year. She also

---

[3]    A job's SVP level, or Specific Vocational Preparation level, denotes the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance[.]" DICTIONARY OF OCCUPATIONAL TITLES, app. C, 1991 WL 688702. The SVP 2 level requires anything beyond short demonstration up to and including one month of training. *Id.* A job's SVP level also corresponds to its skill level. *See* 20 CFR §§ 404.1568 and 416.968. SVP levels of 1-2 correspond to "unskilled" work.
Regulations further define skill level. *See* 20 CFR §§ 404.1568(a)-(c) and 416.968(a)-(c). Unskilled work "requires little or no judgment to perform simple duties that can be learned on the job in a short amount of time[.]" *Id.*

drives herself to doctor appointments.

Moss further testified that she goes to a friend's house two or three times a month to do her laundry and just to get out, and washes dishes from time to time. She said she has problems lifting. She also said that after standing to brush her teeth, she has to lie down for 20 minutes to rest, and after taking a shower has to lie to down for 20-30 minutes. She said she has problems sitting. She also testified that she rode in a car for one hour to attend the hearing before the ALJ and stopped once for a restroom break, and the ALJ noted that Moss sat through the hearing, which lasted 50 minutes. Tr. 26. Moss smokes one or more packs of cigarettes a day, although she has been advised by her doctors to stop. She said she uses oxygen and a cane. The ALJ noted that she did not have them at the hearing. She testified that medication helped her pain symptoms somewhat. Tr. 50. She is sensitive to temperature extremes.

Moss said that in the past 15 years, she has worked for about four months as a cashier (in 2004) and briefly at an Arby's but quit because of pain (in 2009). More remotely in time, she worked in a call center. She has not looked for work since 2009. She testified that she cannot work full time because of pain she experiences in her neck, shoulders, back, and left thigh, and lung pain and breathing difficulties.

Moss did not mention depression during her testimony. She did testify that the physical pain she experiences causes confusion. Specifically, "[T]his last year, it seems like there's times, for a few moments or a minute, I feel like I'm not sure where I'm at or what I'm doing. But I mean, I always figure it out. I have trouble remembering things a lot in all kinds of ways[]" and "[i]t's hard to think." Tr. 51. She also testified, "[M]y pain is so bad I have a hard time dealing with noise, a lot of noise, other people, a lot of people talking[.]" Tr. 53. An LPN from Tiffany-In-Home Services visits once a week and sets up Moss' medications because Moss "has a hard

time remembering to take" her pills and the help "makes it a lot better."  Tr. 55.

In her Adult Function Report prepared in June 2013, Moss stated that she has to go to bed several times per day due to pain and can only walk half of a block at a time.  She can pay bills and manage her money; drive and shop; provide for her own personal care with some pain; prepare microwave meals; wash dishes; do laundry with assistance; and get along with authority figures.  She watches television and reads.  She stated that she has trouble with memory, completing tasks, concentrating, and understanding.  She has no trouble getting along with authority figures.  She also reported that she can follow short, simple, written instructions, and where asked on the form whether she could follow spoken instructions, she answered, "I understand[.]  I'm not dumb."  Tr. 188.

A friend, Deloris McCulloh, also filled out a function report and similarly stated that Moss provides for her own personal care slowly, prepares meals, does laundry with help, drives, shops, reads, watches television, and manages her own money.

Moss' employment records show that her work history is sparse and she has had low earnings.  Her highest learnings were in 1989 when she earned about $8,300 and in 2004 when she earned about $10,700.  In 1983, 1984, 1985, 1988, 1989, 1996, 1999, 2003, and 2007 she earned between about $1240 and $4700 annually, and in the other years she earned a few hundred dollars or nothing.  In the entirety of her adult life, she has earned a grand total of about $40,000.

### E.    Other evidence

The Cooperative Disability Investigations Unit—Kansas City, Missouri received a referral in connection with Moss' current application for SSI benefits, prior to the ALJ's decision, to investigate Moss' ability to function.  The CDI was asked to observe, among other

things, whether Moss appeared overly depressed or sad, or nervous or anxious; appeared to have difficulty understanding or following normal conversation; interacted in a socially appropriate manner; had difficulty leaving home; appeared to become easily confused; or appeared to exhibit obvious pain mannerisms. Tr. 351-52.

The CDI investigator prepared a report in August 2013. Tr. 349. He stated that on August 12, 2013, Moss was scheduled for a consultative exam with Dr. Preylo at 9:45 a.m., but was late. The investigator went to Moss' apartment in Kingston, Missouri at 10:15 a.m. and found that she was not at home. The investigator talked to a maintenance worker at the apartment complex, who said that the prior evening, Moss had contacted him about moving a chain that keeps vehicles off the lawn, so she could move some "heavy items" to her apartment. Tr. 355. The maintenance worker said that he had seen her walking without a cane and carrying items from her car to her apartment in the past, and walking in the grass to avoid the stairs. He also said that Moss would leave in the morning almost daily and come back around 10:00 p.m., but he did not know where she would go. He said he had never seen Moss confused.

The investigator left a voice message for Moss on March 12, 2013. She returned the call two days later, explaining that she had delayed calling back because she was concerned he was running some kind of scam and she first wanted to contact the Sheriff's Department about it. Tr. 356. She told the investigator that she had missed the evaluation with Dr. Preylo because she was ill and had stayed at a friend's house where it took her most of the day to feel better. The investigator asked her about prior addresses of places where she had lived, and she said Weatherby and Independence, but said she did not recall the street addresses. She stated that she did shop and the last place where she had shopped was Dungy's Markey in Maysville, Missouri.

The investigator obtained surveillance videos of two separate visits that Moss had made

to WalMart in Cameron, Missouri, and stated that they showed Moss had "no apparent difficulty" during the visits. Tr. 354. Specifically, the report stated, the videos showed that Moss walked without using a cane, lifted items out of her cart and put them on the conveyor belt at the check-out, and then lifted the items off the belt and placed them back the cart after check-out. She walked out of the store with a normal gait and did not exhibit pain mannerisms. She did not use a motorized shopping cart.

## F.    The ALJ's decision

The ALJ found that during the relevant period, Moss had severe impairments of fibromyalgia, chronic pain syndrome, chronic obstructive pulmonary disease, degenerative disc disease of the cervical spine, degenerative joint disease of the right shoulder, and obesity. Tr. 16. Moss did not claim to meet any Listings and the ALJ did not find that she met any.

The ALJ found Moss has the residual functional capacity (RFC):

> [To] lift ten pounds frequently and twenty pounds occasionally, sit for up to six hours in an eight-hour workday, and stand and/or walk for up to six hours in an eight-hour workday; she needs to alternate between sitting and standing at least every thirty minutes; she can occasionally stoop, kneel, crouch, and climb ramps or stairs; she should never balance, crawl, or climb ladders, ropes, or scaffolds; she can reach overhead occasionally, bilaterally; she should avoid exposure to extreme heat and extreme cold, as these terms relate to weather conditions; she should avoid exposure to humidity, excessive vibration, and unprotected heights; and she may be exposed to no more than occasional pulmonary irritants.

Tr. 19.

The ALJ concluded that Moss "is capable of performing past relevant work as a call center customer service representative (skilled work with an SVP of 5 at the sedentary exertional level)," and that such work "does not require the performance of work-related activities precluded by" Moss' RFC. Tr. 26. The ALJ further determined that based on Moss' age,

education, and RFC, she would be able to perform the requirements of representative occupations such as retail marker, inserting machine operator, and electronics sub-assembler. Each of the three occupations is classified as unskilled, SVP 2, and light exertional level, and available in significant numbers in the national and Missouri economies. The ALJ further noted that each of the three occupations can be performed by a person who is limited to no overhead reaching, bilaterally. Accordingly, Moss' application was denied.

## II.    Discussion

Moss argues that in determining her RFC, the ALJ failed to adequately evaluate the severity of her depression, give good reasons for assigning little weight to the opinions of Dr. Jain, or establish a properly supported RFC. She asks for reversal and award of benefits, or remand for a new hearing.

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). The Court does not reweigh the evidence presented to the ALJ, nor does it review the factual record *de novo*. *Baldwin v. Barnhart,* 349 F.3d 549, 555 (8th Cir. 2003) (citation omitted), and *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir. 1996) (citation omitted). Instead, if after reviewing the evidence the Court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [then the Court] must affirm the [Commissioner's] denial of benefits." *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010) (internal quotation and citation omitted). This is true even in cases where the Court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (internal quotation and citation omitted). The Court may not reverse the Commissioner's decision "merely because substantial evidence

would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) (citation omitted) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### A. The ALJ's determination that Moss had a non-severe mental health impairment

The ALJ concluded at the second step of the sequential evaluation that Moss' alleged depression did not cause more than minimal limitation in her ability to perform basic mental work activities and therefore was "non-severe." Moss argues that the ALJ's determination is unsupported by substantial evidence, but the argument fails.

At step two, 20 C.F.R. § 416.920(a)(1), the ALJ must determine whether the claimant has a "severe" impairment that lasted or is expected to last for at least twelve months, 20 C.F.R. § 416.909. A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 416.920(c) and 416.921(a). If an impairment "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities," then the impairment is non-severe. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

The ALJ acknowledged that Moss had a history of depression and examined the record, notwithstanding that Moss never even mentioned depression during her hearing testimony. Dr. Jain, one of Moss' primary care physicians, recorded in the treatment notes from time to time that Moss had a sad or depressed mood, tearfulness, or decreased ability to concentrate, but other times recorded that Moss' mental status exams were normal and that her mood was euthymic. Dr. Jain in fact never treated Moss for mental health issues, nor formally diagnosed Moss with depression during the relevant time period. Moss cites no authority indicating that a physician's

observation of a depressed mood is consistent with a formal diagnosis of depression. Most significantly, however, Dr. Jain did not in any fashion indicate in the treatment record that the symptoms he observed were of a severity to significantly limit Moss' mental ability to perform basic work activities. 20 C.F.R. §§ 416.920(c) and 416.921(a).

Dr. Irby, another primary care physician, took over Moss' care around mid-2013. In July and September 2013, Dr. Irby did include a formal diagnosis of depression in Moss' treatment records, and prescribed Prozac in September 2013, but the diagnosis and treatment were temporary. The doctor did not include the diagnosis in the record of subsequent visits, nor continue to treat Moss for it with Prozac or another psychotropic, and noted that Moss' mood was euthymic. A "severe" impairment for purposes of step two is one that lasted for least twelve months, 20 C.F.R. § 416.909, which Moss' depression did not.

Similarly, while Moss sometimes told Barb Zoubek, the case/care coordinator from Dr. Jain's and Dr. Irby's office, that she was sad, other times Moss reported to be doing okay. Zoubek's notes also indicate that Moss' reports of sadness were sometimes linked to situational factors such as her husband leaving and seeking a divorce, and the death of a young relative. Situational depression does not support a finding of disability. *See Tindell v. Barnhart*, 444 F.3d 1002, 1007 (8th Cir. 2006) (evidence that the claimant seemed to suffer from situational depression, relating to her housing situation and problems with a neighbor, and had little history of medication for her depression or anxiety, discredited the opinion evidence concerning the effects of her depression on her ability to work, and supported the ALJ's determination that the claimant was not disabled).

The ALJ also considered that Moss never showed up for one scheduled psychological consultative evaluation with Dr. Preylo, and showed up so late to a second one that the exam

could not be performed.  Moss offered that she moved slowly due to pain and refused to return a few hours later the same day so that the evaluation could be performed.  Notwithstanding what Moss told Dr. Preylo's office at the time, she now argues that her failure to show up one time and her late arrival another time actually show she has a mental limitation in maintaining a schedule.  But none of Moss' other medical records indicate that she ever missed or arrived late to any appointments that she scheduled with her regular providers, or in any other contexts, whether due to alleged pain or a mental issue relating to maintaining a schedule.[4]  In any event, the Court does not reweigh the evidence.  To the extent that the record permits two inconsistent positions to be drawn from Moss' failure to participate in the consultative evaluation, the ALJ's decision may not be set aside.

The ALJ further noted that in reaching her conclusion, she had considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and the listing of impairments.  Specifically, the regulations expressly provide that once an ALJ determines a claimant has a mental impairment, a claimant's degree of  functional limitations must be rated based on her "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  *See* 20 C.F.R. § 416.920a(b)-(c); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).  If the ALJ rates the claimant as "mild" or "none" in all four domains, then the mental impairment is not severe.  *See* 20 C.F.R. § 416.920a(d)(1).

Here, the ALJ concluded that Moss had no limitations in her daily activities, social functioning, and concentration, persistence, or pace, and had no episodes of decompensation.

---

[4]     The Court also observes that Dr. Preylo had previously performed a mental evaluation of Moss in connection with her prior application.  The ALJ in that prior case gave Dr. Preylo's opinion significant weight, concluding that it was consistent with a finding that Moss' mental condition did not cause more than minimal limitation in her ability to perform basic work activities, and that her mental condition therefore was non-severe.  Tr. 84.

First, the ALJ noted that Moss had no limitations in her activities of daily living. This finding was supported by evidence of Moss' ability to live alone, provide for her personal care with some pain, prepare microwave meals, wash dishes, do laundry with assistance, drive, shop, watch television, read, manage her money, and go to a friend's house, relatives' houses, and doctor appointments.

Second, the ALJ found that Moss had no limitations in social functioning. This finding was supported by evidence that Moss shopped regularly and spent time visiting various family members and a friend, got along with authority figures, and interacted routinely with medical professionals. The ALJ further noted that Moss interacted appropriately during the disability hearing.

Third, the ALJ concluded that Moss had no limitations in concentration, persistence, or pace, citing Moss' report that she can follow simple, short, written instructions, and follow spoken instructions, and could concentrate long enough to drive, shop, watch television, read, and handle her money.

Finally, the ALJ noted that there was no evidence of any episode of decompensation.

Substantial evidence on the whole record supports the ALJ's determination that Moss' mental impairment was non-severe for purposes of step two.

**B.      The weight given to Dr. Jain's opinions**

The ALJ gave Dr. Jain's opinions little weight at the fourth step in the sequential evaluation process, determination of residual functional capacity. 20 C.F.R. § 416.920(e).[5] Moss argues that they were entitled to controlling weight, but the argument fails.

---

[5]      When determining a claimant's RFC, the ALJ must consider all of the claimant's impairments, including ones that are non-severe. 20 C.F.R. §§ 416.920(e) and 416.945, and Social Security Ruling 96-8p. In this case, then, the ALJ was required to consider the effect of Moss' non-severe mental impairments.

An ALJ considers the medical opinions together with the rest of the relevant evidence in determining disability, 20 C.F.R. § 416.927, and need not base her decision on the opinion of any one particular physician, *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). When evaluating medical opinion evidence, the ALJ considers factors such as:

- How long the source has known, and how frequently the source has seen, the claimant;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion; and
- Whether the source has a specialty related to the claimant's impairments.

*See* 20 C.F.R. § 416.927(c); Social Security Ruling 06-03p. An ALJ generally gives a treating physician's opinion more weight than opinions of other medical sources, but the ALJ must consider whether the opinion is consistent with the record as a whole. 20 C.F.R. § 416.927(c-d). Ultimately, it is up to the ALJ to determine the weight each opinion is due. *See Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). Moreover, the ALJ remains the ultimate arbiter of a claimant's RFC. 20 C.F.R. § 416.927(d)(2).

### 1. The Medical Source Statement—Medical

Dr. Jain filled out a Medical Source Statement—Mental form in May 2013, in which he opined that Moss had extreme psychological limitations. Specifically, he stated that Moss had marked limitations maintaining attention and concentration, performing activities within a schedule, working with others, getting along with coworkers, and responding appropriately to supervisors. The opinion is inconsistent with Dr. Jain's treatment records, as well as other evidence. Dr. Jain's treatment notes from the same day he signed the evaluation noted that Moss' mental status examination was "normal." Tr. 313. Dr. Jain's treatment notes in fact frequently stated that Moss' mental status examinations were normal, and he never formally diagnosed

Moss with any mental impairment, prescribed any psychotropic medications, nor referred her for treatment by a specialist. He checked off that Moss moderately or markedly limited in abilities such as punctuality, social interactions, getting along with supervisors, and adhering to basic standards of neatness and cleanliness, but his treatment records never noted that Moss was late to appointments, had any difficulties interacting with him or his office staff, or that she appeared unkempt or dirty. Furthermore, although Dr. Jain's treatment notes from time to time indicated that Moss had decreased ability to concentrate, they never indicated Moss had such extreme and broad mental limitations as the ones he checked off , let alone that she had had them or could be expected to have them for a period of at least twelve months. Moreover, Dr. Jain did not provide any explanation for his extreme opinions.

Dr. Jain's opinion is also inconsistent with other records. Dr. Irby did treat Moss for depression in mid-2013, *i.e.*, after Dr. Jain filled out the form, but the treatment lasted only a few months. Dr. Irby subsequently noted that Moss' mood was euthymic. The records of Barbara Zoubek, a case manager in Dr. Jain's and Dr. Irby's office, noted Moss' complaints that she was sad about her divorce and sad when a young family member died, but that other times she was doing alright and did not want to work on any health issues. That Moss has had limited treatment for depression, or may have experienced situational depression, detracts from Dr. Jain's assessment of the effect of Moss' mental limitations on her ability to work. *See Tindell*, 444 F.3d at 1007. Other evidence inconsistent with Dr. Jain's opinion is the CDI report, which includes the observation of a maintenance worker at Moss' apartment complex, who had had the opportunity to observe her comings and goings, had interacted with her, and had not observed her to be confused.

Moss argues in her reply brief that to the extent the ALJ did not expressly cite or rely on

certain evidence in the record in writing the decision, such evidence cannot be considered now. But an ALJ is not required to expressly mention every piece of evidence considered in reaching his or her decision. *Wheeler v. Apfel*, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (explaining that an ALJ is not required to discuss every piece of evidence submitted, and that the failure to cite specific evidence does not mean the ALJ failed to consider it) (citing *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998)). In any event, reversal requires Moss to demonstrate she was prejudiced by the manner in which the ALJ wrote the opinion, which Moss has not shown. *Lacroix v. Barnhart*, 465 F.3d 881, 888-89 (8th Cir. 2006) (holding that the claimant failed to establish the prejudice necessary for reversal).

Moss also suggests that when she reported having no trouble getting along with authority figures, she may simply have been engaging in wishful thinking, so her statement should not be used to discount Dr. Jain's opinion. Doc. 12, pp. 3-4. As noted, the Court does not reweigh the evidence.

The ALJ's decision to give Dr. Jain's opinion concerning mental limitations little weight is supported by substantial evidence on the whole record.

## 2. Medical Source Statement—Physical

Dr. Jain also filled out a Medical Source Statement—Physical in May 2013. Dr. Jain selected the most extreme limitations available under Physical Strength Factors, including that Moss could lift and carry less than five pounds, stand or walk for less than one hour in an eight-hour workday, could sit for less than 15 minutes at a time and less than one hour total in an eight-hour day, and could not push or pull five pounds for more than five minutes at a time. He further stated that Moss needed to use a walking cane and to lie down or sit every 15-30 minutes, and that her pain medications caused "decreased concentration and attention span." Tr. 309. The

ALJ gave the opinion little weight. The ALJ noted that the opinion was inconsistent with the findings of the CDI investigation, including the maintenance worker's observation that Moss walked from her car to her apartment while carrying items, and did not use a cane; and that he had observed Moss leaving home in the mornings and returning at about 10 o'clock at night on a daily basis. The CDI investigation also cited surveillance videos from WalMart showing two separate visits that Moss made and demonstrating no apparent physical difficulties: she shopped without using a motorized cart, walked with a normal gait and without pain mannerisms, and lifted items on and off the conveyor belt at the checkout.

Dr. Jain's extreme opinion is also inconsistent with his treatment records. For example, his treatment notes from the same day that he prepared the MSS-Physical documented some abnormal shoulder range of motion and decreased right upper extremity strength, but also showed intact sensation, normal neck range of motion and stability, normal shoulder stability, and normal muscle tone. His treatment notes of other visits included similar physical exam findings, ranging from normal reflexes and no motor dysfunction, to tenderness with palpation. He never ordered Moss to refrain from physical activities, and in fact noted numerous times under the Counseling/Education section of the treatment record that Moss' goal was to maintain regular exercise. He did not refer Moss for treatment by a specialist. Furthermore, although Dr. Jain's treatment notes from time to time indicated that Moss had decreased ability to concentrate, they did not indicate that the decrease was severe. Nothing in Dr. Jain's treatment records reflect the extreme limitations in his Medical Source Statement.

Dr. Jain's opinion is also inconsistent with Dr. Irby's treatment notes. For example, on December 5, 2013, Dr. Irby found that Moss had no neck problems, no sensory abnormalities, and had a normal musculoskeletal exam. Tr. 530. Dr. Irby did refer Moss for an evaluation by a

rheumatologist, but nothing in the record shows the Moss received treatment from a rheumatologist, or that her treatment was modified based on anything that the consulting rheumatologist found.

Dr. Jain's extreme opinion is also inconsistent with Moss' testimony that she was able to drive herself to places 25 to 60 miles away, do laundry at a friend's house, care for her personal needs, do dishes, and prepare microwave meals.

The ALJ's decision to give Dr. Jain's opinion concerning physical limitations little weight is supported by substantial evidence on the whole record.

### C.    Support for the RFC

Finally, Moss argues that the RFC determination lacks support by substantial evidence on the whole record. The argument fails.

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996).   An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).   The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).   Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of her limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted).   The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217

(8th Cir. 2001).

Specifically, in determining Moss' RFC, the ALJ considered Moss' symptoms and the extent to which they were supported by the medical evidence in the record. *See* 20 C.F.R. § 416.929 ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."). First, the ALJ concluded that Moss' statements regarding her limitations were less than credible.[6] The ALJ noted that Moss' activities of daily living were inconsistent with her alleged limitations. For instance, Moss reported trouble concentrating, but she was able to concentrate enough to drive, read, and watch television. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (activities which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility). She also alleged trouble using her hands, but could do laundry and wash dishes. Additionally, Moss claimed she had problems sitting, yet she regularly drove 50 miles roundtrip to the grocery store, and longer distances to visit relatives. Moss' daily activities did not suggest a need for additional limitations beyond the RFC.

The ALJ also considered Moss' medical treatment when evaluating her credibility. The ALJ noted that according to Moss' chiropractor, Moss' back, neck, and arm pain decreased with treatment and her range of motion increased. Moss also testified that her pain medication helped her pain symptoms somewhat, and that a cortisone shot alleviated some symptoms. *See Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 729–30 (8th Cir. 2003) ("[I]mpairments that are controllable by medication do not support a finding of total disability."); *Gowell v. Apfel*, 242

---

[6] Although Moss does not challenge the ALJ's credibility finding, the ALJ's analysis is inherently part of the RFC evaluation. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.").

F.3d 793, 796 (8th Cir. 2001) (finding that conservative treatment reduced the claimant's credibility). 20 C.F.R. § 416.929(c)(3)(v) (the agency will consider the claimant's treatment when evaluating his symptoms).

Further, physical examinations showed she had no muscle atrophy, and normal strength and stable joints. Where the objective medical evidence is inconsistent with a claimant's allegations, her credibility may be discounted. *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016).

Additionally, the ALJ noted that Moss failed to attend two psychological consultative evaluations, and smoked a pack of cigarettes per day, despite having COPD, and that smoking can exacerbate degenerative disc and joint disease, and being counseled by her doctor to quit. Tr. 25. *See Choate v. Barnhart,* 457 F.3d 865, 872 (8th Cir. 2006) (an ALJ may properly consider a claimant's noncompliance with a treating physician's directions, including failure to quit smoking); and *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) ("The ALJ used the evidence of Holley's noncompliance . . . to weigh the credibility of Holley's subjective claims of pain.").

The ALJ also observed that Moss' sparse work history raised a question as to the true reason for her unemployment. Moss' summary earnings report showed that she worked at the level of substantial gainful activity for no more than one year in her adult life and even that one year reflected very low earnings ($10,681.59). Moss' lifelong failure to work at the level of substantial gainful activity for no more than one year casts doubt upon her motivation to work. *See Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996) (holding that a claimant's prior work history, "characterized by fairly low earnings and some significant breaks in employment," cast doubt on his credibility).

Finally, the ALJ considered the inconsistencies between Moss' claims and the CDI report. For instance, the ALJ noted that Moss said she used a cane and had trouble balancing and lifting. However, the CDI report stated that a maintenance worker in Moss' apartment complex observed her walking without a cane and carrying items from her car to her home. Moss also said she rarely left her apartment, but the maintenance worker reported that Moss left daily in the morning and returned at ten o'clock at night. Additionally, Moss claimed that she needed to use a motorized shopping cart for grocery shopping, which she did about three times a month, yet video surveillance twice showed her shopping with a normal gait, no pain mannerisms, and without a motorized cart. The video surveillance also showed Moss lifting objects into her cart, onto the cashier belt, and back into her cart. *See Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) ("[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances.").

Substantial evidence on the whole record supports the ALJ's assessment of the credibility of Moss' allegations concerning her symptoms and limitations.

The ALJ also expressly stated that she based the RFC finding on Moss' impairments. Tr. 26. In the decision, the ALJ discussed and considered Moss' fibromyalgia, chronic pain syndrome, COPD, degenerative disc disease of the cervical spine, degenerative joint disease of the right shoulder, and obesity, and considered Moss' claims that she had depression and difficulty concentrating. The ALJ determined that Moss had the RFC to perform light work, limited to lifting ten pounds frequently and 20 pounds occasionally; sitting for up to six hours in an eight-hour workday; standing and/or walking for up to six hours in an eight-hour workday; alternating between sitting and standing at least every 30 minutes; occasionally stooping, kneeling, crouching, and climbing ramps or stairs; never balancing, crawling, or climbing

ladders, ropes, or scaffolds; occasional, bilateral overhead reaching; and avoiding excessive vibration and unprotected heights. The RFC determination accounts for Moss' credible limitations relating to fibromyalgia, chronic pain syndrome, degenerative disc disease of the cervical spine, degenerative joint disease of the right shoulder, and obesity, as evidenced by her activities of daily living, physical exams, tests, medical treatment records, and the CDI investigation. The RFC's limitations on exposure to extreme heat and extreme cold, humidity, and only occasional exposure to pulmonary irritants also account for Moss' COPD. *See Moore v. Astrue,* 572 F.3d 520, 523 (8th Cir. 2009) (an RFC determination need only account for credible limitations) (citing 20 C.F.R. § 404.1545(a)(1)).

Furthermore, although the ALJ did not find credible Moss' allegations concerning mental limitations, such as a problem with concentration, the jobs that the ALJ identified were SVP 2 level and unskilled, which corresponds to work that requires little or no judgment to perform, and simple duties that can be learned on the job in a short amount of time. Moss does not demonstrate how such work exceeds her alleged mental limitations.[7]

In short, Moss disagrees with the ALJ's decision, but has not demonstrated prejudicial error. *Byes v. Astrue,* 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless,

---

[7] Moss does not challenge the ALJ's determination to give little weight to the opinions of Brandon Sigrist, the nurse practitioner who examined Moss once, and Dr. Kavanaugh, Moss' chiropractor who treated Moss twice. Moss simply states that even if those opinions were properly discounted, the RFC lacks support. *See* Doc. 8, p. 33.

Nonetheless, the ALJ gave good reasons for discounting the weight of these two opinions. Sigrist opined that Moss had a physical disability that prevented her from working, an ultimate issue that is reserved to the Commissioner, *House v. Astrue,* 500 F.3d 741, 745 (8th Cir. 2007), and in any event, he did not explain what he believed Moss' restrictions to be. Dr. Kavanaugh had only seen Moss twice, the last time more than a year before rendering the opinion. Her opinion was internally inconsistent, in that the doctor identified extreme limitations on movement due to pain, but also stated that treatment had decreased Moss' pain and improved her range of motion. It was also inconsistent with other evidence in the record. For example, the doctor opined that Moss could sit for no more than 45 minutes at a time, but the record showed Moss was capable of driving for longer lengths of time.

[the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred."); and *Lacroix v. Barnhart*, 465 F.3d 881, 888-89 (8th Cir. 2006) (finding that the claimant failed to establish the prejudice necessary for a reversal). The ALJ's decision was supported by substantial evidence on the whole record, including some medical evidence. A court may not reverse an ALJ's decision that is supported by substantial evidence, even if the court would have reached a different conclusion, or merely because substantial evidence also supports the opposite outcome. *Kluesner,* 607 F.3d at 536, and *Culbertson*, 30 F.3d at 939. It was Moss' burden to prove she had a more restrictive RFC and she failed to bear it.

## III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  May 31, 2017
Jefferson City, Missouri